THE LAW OFFICE OF BARRY E. JANAY, P.C.
Barry E. Janay, Esq. BEJ9311
90 Broad Street, 25th Floor
New York, New York 10004
908-633-7238
*Attorneys for Plaintiff Paula Bennice*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAULA BENNICE,<br><br>         Plaintiff,<br><br>   -against-<br><br>COSMOPROF and SALLY BEAUTY<br>HOLDINGS, INC.,<br>         Defendants. | Case No. 1:23-cv-666 (DNH/CFH)<br><br><br>**COMPLAINT AND<br>JURY DEMAND** |

   Plaintiff, Paula Bennice ("Bennice" or "Plaintiff"), who resides at 1708 Union Street, Schenectady, New York 12309, by way of this Complaint against the Defendants, CosmoProf and Sally Beauty Holdings, Inc. ("CosmoProf", "SBHI", or "Defendants") hereby says:

## I.   Nature of Action, Jurisdiction, and Venue

   1. This is an action at law and equity for slander, injury to reputation, and injury to business arising under the common law of New York State (the "common law"), as well as intentional infliction of emotional distress and tortious interference. The Plaintiff alleges Defendants have committed the following wrongs: (1) defamation; (2) defamation *per se*; (3) injury to reputation; (4) injury to business; (5) intentional infliction of emotional distress; (6) negligent infliction of emotional distress; (7) pain and suffering; and (8) tortious interference with business.

2.   This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1332 and the principles of supplemental jurisdiction pursuant to 28 U.S.C. § 1367, as the controversy at issue falls under the Court's diversity of citizenship jurisdiction.

3.   Upon information and belief, Defendants transact business within this district, derive substantial revenue from intrastate and interstate commerce, and have committed tortious acts within this district and also without this district having injurious consequences within this district, and Defendants are otherwise within the jurisdiction of this Court.

4.   Venue is proper in this judicial district pursuant to, at least, 28 U.S.C. §§ 1391, in that the illegal and improper acts which are the basis for the within asserted causes of action occurred in Schenectady, New York, Schenectady County and the Defendants in this matter are organizations doing business in Schenectady, New York.

## II.   Parties

5.   Plaintiff, Paula Bennice, ("Bennice" or "Plaintiff") has her principal place of business at 1708 Union Street, Schenectady, New York 12309.

6.   At all pertinent times, Bennice has lived and worked in Schenectady, New York.

7.   CosmoProf ("CosmoProf") is a corporate entity whose principal place of business is at 3001 Colorado Boulevard, Denton, Texas, 76210.

8.   Sally Beauty Holdings, Inc. ("SBHI") is a corporate entity whose principal place of business is at 3001 Colorado Boulevard, Denton, Texas, 76210.

9.   Thus, all Defendants are subject to the claims brought herein.

10. At all times referred to in this Complaint, the Defendants were doing business in the State of New York where Plaintiff had her business.

11. At all times referred to in this Complaint, Defendants were the employers of Ms. Elizabeth Berrian, store manager of the CosmoProf store located at 1710 Altamont Avenue, Schenectady, New York 12303, and Sarah Hilton, an employee of the same store.

### III.    Factual Allegations

12.    Bennice owns a salon, located at 1708 Union Street, Schenectady, New York 12309 where she has been providing high quality hair styling, cutting, and coloring services to customers within a sixty (60) mile radius of her salon.

13.    Bennice is a local business owner and resident with nearly twenty-five (25) years of providing quality cosmetology services to her community and the surrounding areas.

14.    Since as early as 1998, Bennice has frequented CosmoProf stores, including the store located at 1710 Altamont Avenue, Schenectady, New York 12303, for supplies and items on an as needed basis.

15.    Bennice has been a regular customer of CosmoProf since she began her career and had every intention to continue using this specific location to purchase a portion of her salon supplies.

16.    CosmoProf is a national beauty supply chain whose primary customers are licensed cosmetologists, estheticians, and nail technicians. In order to purchase products from any CosmoProf location, a customer must provide proof of their active license and register an account, which is accessible by all stores and includes purchase history, contact information, frequently purchased products, and other customer-specific information. These accounts can be edited by individual employees at their discretion.

17.    In or about July 2022, Bennice entered the CosmoProf store with the intention of purchasing the Gama iQ Perfetto hair dryer, a value of over $400.

18.     Bennice completed her purchase and took the hair dryer to her salon for use serving her customers.

19.     After only about twenty (20) days of use, the heating component of the hairdryer broke, rendering the device largely useless.

20.     Bennice brought the issue to the attention of the newly hired store manager, Ms. Elizabeth Berrian ("Berrian"), immediately thereafter and requested a replacement for the broken device.

21.     Berrian informed Bennice that she was unable to provide a replacement at that time because the store was out of stock of that particular model, but that she would replace the hairdryer without issue when it was available again.

22.     Berrian advised Bennice that she would call to let Bennice know when the item was available so Bennice could stop by and make the exchange.

23.     Over the course of the next few weeks, Bennice heard nothing from Berrian or any other store employee and inquired about the status of the restock and replacement. Berrian told Bennice that the hairdryer was still not in stock and that she would have to wait.

24.     At this time, Bennice was happy to be patient and believed Berrian's assertions that because Bennice had brought the issue to Berrian's attention immediately after the hair dryer broke, there would be no issue getting a replacement.

25.     After about ninety (90) days, Bennice was in the store to purchase some supplies for her salon and saw that the hairdryer model she needed replaced was in stock and on the shelf. She brought the hairdryer to the register and attempted to work with the cashier in order to exchange her broken product for the fully functional unit now available.

26.     Berrian, noticing Bennice in the store with the hairdryer, informed her that

because the ninety-day window for replacements had closed, Bennice was not entitled to a replacement or refund and would have to pay full price for the hairdryer.

27.     Bennice attempted to reason with Berrian, referencing their earlier discussion regarding a replacement, but Berrian refused to honor her initial agreement and was generally rude towards Bennice.

28.     Frustrated, Bennice left and purchased the hairdryer from another store.

29.     Later, Bennice was made aware that Berrian had discussed Bennice's request for a refund or replacement with Bennice's main competitor in the community. Berrian and the competitor have a close relationship that is well-known to other professionals in the community.

30.     Sometime later in approximately September 2022, Bennice stopped into the CosmoProf store at approximately 9:30 AM to pick up a few miscellaneous supplies such as foils and developer on her way to open her salon for the day.

31.     Bennice had no notable interactions with any employees or Berrian, paid for her items, and left to go about her day.

32.     That afternoon at approximately 1:00 PM, Bennice received a call from the local sheriff's department lieutenant regarding her being banned from the CosmoProf store for shoplifting. Bennice had no idea what the officer was referring to.

33.     When he elaborated, the officer informed her that a store employee had called them and said she "assumed there was theft involved" and that she had warned Bennice about shoplifting in the past.

34.     Bennice informed the officer that this was not true and that she had never shoplifted from any store, let alone that specific CosmoProf. The officer advised Bennice to contact the corporate office for assistance in clearing up the situation.

35.     During the course of this phone call, the officer assured Bennice, whose reputation he was aware of, that he did not think the allegations were true, but was required to call and complete an investigation regardless.

36.     Bennice received a copy of the police report, which states that there was no evidence of her shoplifting, and that the investigation was concluded.

37.     Bennice took the officer's advice and called the CosmoProf corporate office, received an apology, and was told the issue would be investigated and that they would follow up with her.

38.     Bennice did not receive a call back from the CosmoProf corporate department, but instead received a letter stating that she was banned from not only her local CosmoProf store, but all CosmoProf stores in New York State, based on Berrian's assertions.

39.     Bennice, though shocked by this development and confused as to why she would be banned, accepted it and moved on.

40.     Approximately two (2) weeks after receiving the letter from corporate, a colleague of Bennice's, Daria Ryan ("Daria"), went to the CosmoProf store with her mother and a client.

41.     While there, Daria selected the products she needed, went to the cashier, and attempted to pay for her items.

42.     The cashier at the register was unable to find Daria's account, which is required of all CosmoProf customers, despite trying multiple times, and called over to another employee whom Daria knew to be close with Berrian.

43.     The other employee approached the register and found Daria's account in the point of sale system without issue. When the account was pulled up, Daria saw that she had been

flagged for shoplifting and theft.

44.     When Daria asked why there was a flag on her account, the second employee stated, loudly, that Daria was associated with Bennice and therefore she was likely shoplifting as well.

45.     Daria, understandably embarrassed to have such allegations made in front of her mother and a client, quickly concluded the transaction and left the store.

46.     Shortly thereafter, the client who was present with Daria during the confrontation informed her that she was not interested in being serviced by a stylist accused of shoplifting.

47.     Bennice and Daria called the CosmoProf corporate office to report the situation and filed a case with them to investigate what had happened.

48.     Shortly after their report to corporate, Daria answered another call at the salon from the local sheriff's department lieutenant claiming that Ms. Sarah Hilton ("Hilton"), under Berrian's authority, had again reported Bennice for shoplifting and harassment. They alleged that Bennice had been calling the store nonstop for that entire day and would not stop.

49.     At that time, Bennice had been in her salon, servicing clients and working with colleagues, all day. It would have been impossible for her to have done what she was accused of, and Bennice informed the officer that she had a salon full of witnesses to attest to that fact.

50.     Again, the officer concluded his investigation and the report stated that Bennice had not shoplifted, called the store, nor harassed any employee of the store, including Berrian and Hilton.

51.     Resigned regarding her ban from the stores and frustrated by the employees' consistent reports to the police on allegations that were completely false, Bennice found an alternative beauty supply company and made her purchases there instead.

52.     At all times, every item Bennice or her colleagues purchased from CosmoProf was fully paid for at the time of purchase or charged to a CosmoProf credit card which was paid monthly by the statement due date.

53.     Shortly after the second call from the local sheriff's department, Bennice was informed by another stylist she was acquainted with that she had overheard Berrian and Hilton talking about Bennice and her frequent shoplifting.

54.     This understandably shocked Bennice, as she had never shoplifted from the store and had stopped purchasing items from them completely by that point.

55.     Berrian's and Hilton's statements included the following, or words to this effect, which were said to a colleague of hers and/or overheard by other shoppers in the store, including the stylist who reported the incident to Bennice:

      a.    "I've asked her to put items back on the shelves in the past;"

      b.    "She's calling the store nonstop to harass us;" and

      c.    "With her, I assume theft is involved."

56.     By about early October 2022, Bennice had heard from numerous colleagues, clients, and family members that Berrian and Hilton were still making false accusations about Bennice shoplifting at the CosmoProf store.

57.     Despite her best efforts to ignore the situation and not engage with Berrian or Hilton, their behavior continued unchecked.

58.     Throughout these events, Bennice began noticing that her normally fully booked salon was losing customers at a rapid rate. From approximately October 2022 to present, her profits dropped by approximately 80%.

59.     Bennice attempted to remedy the situation by taking measures to make her salon

more attractive to new and existing customers. She placed advertisements, sent out coupons, and lowered her prices, but nothing helped her recoup the business she had lost and was continuing to lose.

60.     By this point, Bennice, whose salon had two (2) "booths" available for rental by stylists, had lost her booth-renters as well, further reducing her profits and making it impossible for her to maintain her bills, including rent.

61.     As an explanation for why they left, the booth renters informed Bennice that her salon was not bringing in enough business to maintain their own expenses.

62.     Bennice began connecting the timeline of Berrian's false allegations of theft with the extreme downturn in business she had experienced.

63.     The date of Berrian's and Hilton's initial false allegations and police reports and the date that Bennice's business began to decrease fell within 1-2 weeks of one another and no other factor had changed in Bennice's business or services.

64.     With the knowledge that her reputation had been defamed by Berrian and Hilton, Bennice understood that her salon business would not recuperate in time for her to pay her upcoming rent, and so Bennice attempted to find a second job to alleviate the financial pressure she was experiencing due to the employees' false statements.

65.     She was hired by Progressions Salon in Schenectady, New York, to assist the owner and master stylist, Bart.

66.     Upon starting her job, she arrived on time, completed exemplary work, and was told by Bart that he believed her to be overqualified for the assistant role but was lucky to have her.

67.     At this time, Bart was booked by customers to the point where working without

an assistant would be impossible.

68.     Four days after beginning work at Progressions Salon, Bennice was terminated. The reason given was that "Bart doesn't need an assistant at this time."

69.     Bennice strongly suspected that her termination was due to the shoplifting rumors reaching Bart, causing him concern based on the false allegations.

70.     Bennice has since applied for at least seven separate assistant positions at various salons and has either been rejected or ignored by every single one.

71.     Bennice's twenty-five (25) year track record as a successful stylist should have been enough to secure her a position as a stylist's assistant, but even that role is out of her reach due to the damage from the defamatory statements.

72.     Additionally, during this ordeal, Bennice noticed that her previously well-managed heart condition was becoming harder to keep under control.

73.     Heart conditions are often exacerbated by stress and, between the loss of business, knowledge that her reputation had been completely destroyed, and inability to mitigate her circumstances by getting a second job in a field she is overqualified for, Bennice has been experiencing far more stress than usual.

74.     Bennice has needed to see her doctor, Dr. John Nolan ("Dr. Nolan"), frequently as this experience has continued and will require frequent checkups to prevent further exacerbation of her heart condition even once the situation is resolved.

75.     If left unchecked, heart conditions can result in stroke, heart attack, or death, and Dr. Nolan informed Bennice on or about January 25, 2023, that her current condition made her high risk for all three.

76.     At her most recent appointment, Dr. Nolan informed her that she had been

diagnosed with paroxysmal atrial fibrillation, hyperlipidemia, ventricular premature depolarization, general anxiety disorder, supraventricular tachycardia, and had an abnormal electrocardiogram.

77.     Prior to the disagreement over replacement of the hairdryer, Bennice and Berrian had spoken at some length about Bennice's heart condition, as Berrian knew someone with the same heart condition.

78.     Berrian's knowledge of the condition, its treatment, and exacerbating circumstances were well-established prior to her conversations with Bennice about the condition.

79.     With full knowledge of Bennice's heart condition and the effect stress has on a person dealing with a heart condition, the defamatory actions were nothing short of malicious.

80.     Berrian and Hilton filed numerous false police reports, accused Bennice of harassment and shoplifting, and destroyed Bennice's reputation by spreading false rumors about Bennice's character in the small and tight-knit community of cosmetologists in the area.

81.     Every statement Berrian and Hilton made in relation to Bennice's reputation, propensity for shoplifting, and general character were made while they were acting in their official capacities as store manager and employee, directly representing CosmoProf in those interactions.

82.     All police reports and complaints from Berrian and Hilton were made in their official capacity as store manager and employee and while representing CosmoProf's interests in those interactions.

83.     Given their positions as store manager and employee and their assertions to have personal knowledge of Bennice's shoplifting and theft at their particular store, Berrian's and Hilton's statements would likely be believed by others in the community, while Bennice does not

carry such authority when making her defenses.

84.     Upon information and belief, Berrian and Hilton have not ceased their defamatory and baseless accusations, causing further harm to Bennice unless relief can be granted.

85.     Bennice's claims herein arise under state and common law defamation laws; provided, however, that Bennice reserves the right to allege additional causes of action under all applicable local, state, and federal laws.

86.     CosmoProf, Sally Beauty Holdings, Inc., and Beauty Systems Group LLC, through their employees' acts and/or omissions as alleged herein under a theory of respondeat superior, subjected Bennice to unlawful defamation in the form of Berrian's and Hilton's consistent and unchecked spreading of harmful rumors intended to destroy the reputation of a local business owner, stylist, and community member.

87.     As a direct and proximate result of Defendants' treatment of Bennice, she has suffered and continues to suffer injuries and damages, including but not limited to: past and future lost wages, such as loss of paid salon services, booth rental income, and tips; past and future advertising costs to mitigate the circumstances caused by Berrian and Hilton; past and future out-of-pocket expenses, such as penalties for late payments for salon rent and utilities, premiums and increased co-pays for medical coverage and care; past and future emotional distress damages; past and future pain and suffering; past and future loss of benefits of employment and business ownership; past and future harm to professional reputation; past and future harm to personal reputation; and other past and future pecuniary and non-pecuniary damages as will be demonstrated at the trial in this matter.

88.     Defendants' treatment of Bennice, committed via their employees, Berrian and Hilton, was willful, outrageous, malicious, and conducted with full knowledge of wrongdoing.

89.     As a result of Defendants' unlawful treatment, Bennice has suffered and will continue to suffer legal and economic harm, and is entitled to injunctive relief and damages, including punitive damages, in an amount to be determined by a jury at the time of trial.

90.     As of today's date, Bennice remains unable to recoup her financial losses and remains at risk of serious medical complications or death, in part due to the extreme emotional anxiety associated with the situation and surrounding circumstances.

91.     Bennice has now been forced to retain an attorney and protect her rights and assert her claims.

## COUNT I
### (Defamation)

92.     Plaintiff realleges and repeats all the assertions above as if set forth within.

93.     As stated above, Defendants, via their employees, Berrian and Hilton, have stated false information regarding Plaintiff's propensity for theft and shoplifting.

94.     These statements were untrue and defamatory in that they were falsely stated to colleagues, customers, and other community members, and falsely reported to police.

95.     Berrian and Hilton knew or should have known that such defamatory statements were false.

96.     Berrian and Hilton made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

97.     Berrian's and Hilton's statements constitute defamation because they impugn Plaintiff's honesty, trustworthiness, reputation for abiding by the law, and general integrity of character by falsely claiming that Plaintiff shoplifted from the CosmoProf location at issue on more than one occasion.

98.    Berrian's and Hilton's statements constitute defamation because they accuse Plaintiff of committing a crime, namely, theft.

99.    Berrian's and Hilton's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry, have caused her substantial economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, job security, and opportunities for career advancement and have caused her embarrassment, humiliation, and emotional and physical injury.

100.    Defendants are liable for the actions of their employees under a theory of respondeat superior.

101.    New York courts have long recognized that:

The doctrine of respondeat superior renders an employer vicariously liable for torts committed by an employee acting within the scope of the employment. Pursuant to this doctrine, the employer may be liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of employment. *RJC Realty Holding Corp. v. Republic Franklin Insurance*, 2 N.Y.3d 158, 164 (N.Y. 2004) citing *Riviello v. Waldron*, 47 N.Y.2d 297, 304 (N.Y. 1979).

102.    In determining whether an employee was acting within the scope of their employment, "the employer need not have foreseen the precise act or the exact manner of the injury as long as the general type of conduct may have been reasonably expected" and "where the element of general foreseeability exists, even intentional tort situations have been found to fall within the scope of employment." *Riviello* at 304.

103.    Courts have established that the test for determining whether an employee was acting within the scope of their employment is not one of negligence, but rather "whether the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Id* at 302, citing *Jones v. Weigand*, 134 App. Div. 644, 645 (N.Y. App. Div. 1909).

104.    Some factors considered by courts in determining whether an employee's conduct falls within the scope of their employment include:

> (1) the connection between the time, place, and occasion for the act; (2) history of the relationship between the employer and employee as spelled out in actual practice; (3) whether the act is one commonly done by such an employee; (4) the extent of the departure from normal methods of performance; and (5) whether the specific act was one the employer could reasonably have anticipated. *Riviello* at 303.

105.    Generally, "An employee's actions fall within the scope of employment where the purpose in performing such actions is to further the employer's interest, or to carry out duties incumbent upon the employee in furthering the employer's business." *Ciccone v. City of New York*, 138 A.D.3d 910, 910-911 (2nd Dept. 2016) citing *Beauchamp v. City of New York,* 3 A.D.3d 465, 466 (2nd Dept. 2004).

106.    Berrian's and Hilton's conduct at issue in this Complaint were (1) carried out while at work, on the premises of the CosmoProf store they were tasked with managing and attending to; (2) aligned with their duties as manager and employee, such as enforcing store policies and managing customer issues; (3) an action commonly done by employees in their positions, as reporting theft to the appropriate authorities falls within those standard duties; (4) a

very slight departure from the normal methods by which they would perform their jobs, at most; and (5) reasonably foreseeably by an employer, in that a store manager and employee would be expected to make reports to police on the topic of theft should such a situation arise.

107.     Defendants' employees were acting in furtherance of Defendants' interests when they made their false reports to the local sheriff's department and were carrying out the duties assigned to them in furthering Defendants' business.

108.     Regardless of whether the false statements were made with knowledge of falsehood or mere negligent or reckless disregard as to the truthfulness of such statements, Berrian and Hilton were unequivocally acting on Defendants' behalf, furthering Defendants' business interests and needs, and their actions were foreseeable within the context of their employment and job duties.

109.     As such, Defendants are liable for Berrian's and Hilton's wrongful, harmful, and malicious conduct towards Plaintiff.

110.     As a direct and proximate result of Berrian's and Hilton's defamation, Plaintiff has suffered, and continues to suffer, humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace, mental and emotional distress, pain and suffering, and aggravation of a previously existing medical condition.

111.     As a direct and proximate result of Berrian's and Hilton's conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

112.     Berrian's and Hilton's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights or well-being. As such, Plaintiff is entitled to an award of punitive damages.

## COUNT II
### (Defamation *per se*)

113.    Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

114.    As expressed above, Defendants, via Berrian and Hilton, have stated false information regarding Plaintiff's actual commission of and propensity to commit the crimes of theft and shoplifting.

115.    These statements were untrue and defamatory in that they were falsely stated to colleagues, customers, and other community members, and falsely reported to police.

116.    Berrian and Hilton knew or should have known that such defamatory statements were false, and would have known due to her position as store manager.

117.    Berrian and Hilton made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

118.    Berrian's and Hilton's statements constitute defamation *per se* because they impugn Plaintiff's honesty, trustworthiness, accuse her of a crime, and have damaged and prejudiced Plaintiff in her business, trade, and profession.

119.    Berrian's and Hilton's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry; have caused her substantial economic harm; have caused her to incur special damages in the form of actual pecuniary loss, including lost income, job security, and opportunities for career and business advancement; and have caused her embarrassment, humiliation, and emotional and physical injury.

120.    Berrian's and Hilton's statements have decimated Plaintiff's business reputation, causing her profits to drop nearly eighty (80) percent in a matter of weeks once such statements

were made.

121.    As a direct and proximate result of Berrian's and Hilton's defamation, Plaintiff

has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss

of self-esteem and public esteem, public disgrace, mental and emotional distress, pain and

suffering, and aggravation of a previously existing medical condition.

122.    As a direct and proximate result of Berrian's and Hilton's conduct, Plaintiff has

suffered, and continues to suffer, harm for which she is entitled to an award of monetary

damages and other relief.

123.    Berrian's and Hilton's defamatory statements were malicious, willful, wanton,

and done with reckless disregard for Plaintiff's rights or well-being. As such, Plaintiff is entitled

to an award of punitive damages.


## COUNT III
### (Injury to Reputation)

124.    Plaintiff realleges and repeats all the assertions above as if set forth within,

including the analysis of Defendants' liability on a theory of respondeat superior.

125.    As expressed above, Defendants, via Berrian and Hilton, have stated false

information regarding Plaintiff's actual commission of and propensity to commit the crimes of

theft and shoplifting.

126.    These statements were untrue and defamatory in that they were falsely stated to

colleagues, customers, and other community members, and falsely reported to police.

127.    Berrian and Hilton knew or should have known that such defamatory statements

were false.

128.    Berrian and Hilton made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

129.    Berrian's and Hilton's statements constitute injury to reputation because they tend to and have caused harm to Plaintiff's professional and personal reputation for abiding by the law, general integrity of character, and accused her of a crime.

130.    Injury to reputation has been recognized by the court of New York State as a "defamation-type claim" which justice and fairness require, as a policy matter, be heard and considered. *Singer v. Jefferies Company, Inc.*, 160 A.D.2d 216, 219 (N.Y. App. Div. 1990).

131.    Berrian's and Hilton's defamatory statements have harmed Plaintiff's professional reputation and standing in her industry, have caused her substantial economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost income, job security, and opportunities for career advancement and have caused her embarrassment, humiliation, and emotional and physical injury.

132.    But for these false and harmful statements, Plaintiff's personal reputation and her reputation as a business owner and cosmetologist would have remained untarnished.

133.    As a direct and proximate result of Berrian's and Hilton's defamation, Plaintiff has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace, mental and emotional distress, pain and suffering, and aggravation of a previously existing medical condition.

134.    As a direct and proximate result of Berrian's and Hilton's conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

135.    These defamatory statements were malicious, willful, wanton, and done with

reckless disregard for Plaintiff's rights or well-being. As such, Plaintiff is entitled to an award of damages under the principles of justice and equity.

## COUNT IV
### (Injury to Business)

136.     Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

137.     As expressed above, Defendants, via Berrian and Hilton, have stated false information regarding Plaintiff's actual commission of and propensity to commit the crimes of theft and shoplifting.

138.     These statements were untrue and defamatory in that they were falsely stated to colleagues, customers, and other community members, and falsely reported to police.

139.     Berrian and Hilton knew or should have known that such defamatory statements were false.

140.     Berrian and Hilton made such defamatory statements with knowledge of their falsity and/or with a reckless disregard for their truth or falsity.

141.     These statements create a claim for injury to business because they impugned Plaintiff's honesty, trustworthiness, reputation as a business owner, accuse her of a crime, and have damaged and prejudiced Plaintiff in her business, trade, and profession.

142.     These defamatory statements have harmed Plaintiff's business reputation and standing in her industry, have caused her substantial economic harm, have caused her to incur special damages in the form of actual pecuniary loss, including lost profits and have caused her embarrassment, humiliation, and emotional and physical injury as a business owner in the

community.

143.    Berrian's and Hilton's statements have destroyed Plaintiff's business reputation, causing her profits to drop nearly eighty (80) percent in a matter of weeks once such statements were made.

144.    As a direct and proximate result of Berrian's and Hilton's defamation, Plaintiff has suffered, and continues to suffer, from humiliation, loss of standing in the community, loss of self-esteem and public esteem, public disgrace, mental and emotional distress, pain and suffering, and aggravation of a previously existing medical condition.

145.    As a direct and proximate result of such conduct, Plaintiff has suffered, and continues to suffer, harm for which she is entitled to an award of monetary damages and other relief.

146.    Berrian's and Hilton's defamatory statements were malicious, willful, wanton, and done with reckless disregard for Plaintiff's rights or well-being. As such, Plaintiff is entitled to an award of punitive damages.


**COUNT V**
**(Intentional Infliction of Emotional Distress)**

147.    Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

148.    As expressed above, Defendants, via Berrian and Hilton, engaged in conduct towards Plaintiff that is extreme and outrageous as to exceed the bounds of decency in a civilized society; namely, by subjecting her to defamatory statements, publicly accusing her of the crime of theft, and falsely reporting these statements to the local sheriff's department, causing law

enforcement to confront Plaintiff on more than one occasion.

149.    At all relevant times that such statements were made, Berrian was aware of Plaintiff's pre-existing heart condition, and was aware that stress can and typically does exacerbate such conditions.

150.    Berrian was aware, or should have been aware, that increasing stress and anxiety for an individual suffering from this type of condition can and often does lead to stroke, heart attack, and death.

151.    Regardless, Berrian made such false statements, or encouraged Hilton to make such false statements, on several occasions to different people, with full knowledge of, or at least disregard for, the likelihood that Plaintiff would learn of the statements and react as any other honest person would in the situation by becoming upset and experiencing stress surrounding the circumstances and aftermath of such statements.

152.    As such, these actions were taken with the intent to cause, or disregard for, the substantial probability of causing severe emotional distress and, in Plaintiff's case, severe exacerbation of a heart condition that could lead to her death.

153.    As a direct and proximate result of Berrian's extreme and outrageous conduct, Plaintiff has suffered severe emotional distress.

154.    Berrian's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## COUNT VI
### (Negligent Infliction of Emotional Distress)

155.    Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

156.    As expressed above, Defendants, via Berrian and Hilton, engaged in conduct

towards Plaintiff that created a direct link between the Plaintiff's mental injury and Berrian's and

Hilton's negligence, and Plaintiff's claims include some guarantee of genuineness of the

emotional injury. *Taggart v. Costabile*, 14 N.Y.S.3d 388, 396 (N.Y. App. Div. 2015).

157.    Specifically, Berrian and Hilton subjected Plaintiff to defamatory statements with

knowledge of an underlying heart condition, publicly accused Plaintiff of the crime of theft, and

falsely reported these statements to the local sheriff's department, causing law enforcement to

confront Plaintiff on more than one occasion.

158.    As a result, Plaintiff suffered mental anguish and physical symptoms of the

exacerbation of her heart condition in direct response to such conduct, creating a clear link

between Plaintiff's mental injury and Berrian's and Hilton's negligence in making such

statements.

159.    Plaintiff has alleged and can provide records demonstrating the exacerbation of

her heart condition in direct response to Berrian's and Hilton's conduct, thus satisfying the

requirement of some guarantee of genuineness.

160.    At all relevant times that such statements were made, Berrian was aware of

Plaintiff's pre-existing heart condition, and was aware, or should have been aware, that stress can

and typically does exacerbate such conditions.

161.    Berrian was aware, or should have been aware, that increasing stress and anxiety

for an individual suffering from this type of condition can and often does lead to stroke, heart

attack, and death.

162.    Regardless, Berrian made such false statements, or encouraged and allowed

Hilton to make such false statements, on several occasions to different people, with full

knowledge of, or at least disregard for, the likelihood that Plaintiff would learn of the statements and react as any other honest person would in the situation by becoming upset and experiencing stress surrounding the circumstances and aftermath of such statements.

163.    As such, these actions were taken with negligent disregard of the substantial probability of causing severe emotional distress and, in Plaintiff's case, severe exacerbation of a heart condition that could lead to her death.

164.    As a direct and proximate result of Berrian's negligent conduct, Plaintiff has suffered severe emotional distress.

165.    Berrian's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

## COUNT VII
**(Pain and Suffering)**

166.    Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

167.    As expressed above, Defendants, via Berrian and Hilton, engaged in conduct towards Plaintiff that directly injured Plaintiff emotionally, physically, and financially, as well as caused harm to her business, reputation, and standing in the community and industry.

168.    As alleged above, this conduct was intentional, malicious, willful, and knowing, with full awareness of the harm being done to Plaintiff.

169.    As a direct and proximate result of such wrongful and harmful conduct, Plaintiff has suffered severe emotional distress, exacerbation of a heart condition which result in her incapacitation or death, and mental and physical anguish.

170.    Berrian's and Hilton's conduct was wanton, malicious, willful and/or cruel,

entitling Plaintiff to an award of punitive damages.

## COUNT VIII
### (Tortious Interference with Business Relations)

171.    Plaintiff realleges and repeats all the assertions above as if set forth within, including the analysis of Defendants' liability on a theory of respondeat superior.

172.    Plaintiff owns and operates a lawfully incorporated and registered business within the State of New York, with the primary purpose of providing hair cutting, coloring, and styling services to the local community.

173.    New York case law has recognized that where a contract is not at issue, a Plaintiff may still allege tortious interference with prospective business relations, provided, however, that they establish "more culpable" conduct and interference effectuated by "wrongful means" including "physical violence, fraud or misrepresentation…" *Guard-Life Corp. v. S. Parker Hardware Manufacturing Corp.*, 50 N.Y.2d 183, 190-191 (N.Y. 1980).

174.    Berrian's and Hilton's conduct meets the threshold of being "more culpable" due to the underlying tort of defamation at issue. Because the false and defamatory statements were made intentionally, willfully, and maliciously, Berrian and Hilton are more culpable than if they had not engaged in such conduct.

175.    Further, false and defamatory statements fall within the court's established understanding of "wrongful means" in that such statements are misleading by their nature.

176.    As a direct and proximate result of such wrongful and harmful conduct, Plaintiff has suffered significant financial damage to her business, complete destruction of her business and professional reputation, and direct and indirect interference with potential business opportunity.

**177.**   Berrian's and Hilton's conduct was wanton, malicious, willful and/or cruel, entitling Plaintiff to an award of punitive damages.

**WHEREFORE,** as to each and every count, Plaintiff demands judgment on each and all of these Counts against Defendants, jointly and severally, as follows:

A.   Compensatory damages consisting of, at a minimum:

1.   Loss of past and future income and profits in the amount of $8,000,000;

2.   Loss of professional reputation in the amount of $1,000,000;

3.   Loss of business reputation in the amount of $1,000,000;

B.   Damages for humiliation, mental, and emotional distress in the amount of $500,000;

C.   Past and future medical expenses in the amount of $500,000;

D.   Statutory damages, if applicable;

E.   Punitive damages and or liquidated damages where and to the extent permitted by law, including treble damages should the Court find the defamatory acts were willful, intentional, and malicious;

F.   Attorneys' fees and costs of suit;

G.   Lawful interest, including pre-judgment interest on lost income and profits;

H.   Injunctive relief in the form of Defendants' being enjoined from further defaming Plaintiff in any form; and

I.   Such other, further, and different relief as the Court deems fitting, just, and

proper.

Plaintiff hereby reserves the right to amend this Complaint to supplement or modify the factual obligations and claims contained herein, based upon information received from the Defendants, witnesses, experts, and others in the course of discovery in this matter.

DATED:        June 2, 2023

                        **THE LAW OFFICE OF BARRY E. JANAY, P.C.**
                        ***Attorneys for Plaintiff Paula Bennice***

**By:**  _____
                        **BARRY E. JANAY, ESQ.**
                        **For the Firm**

# Bennice Complaint 2 June 2023 - to be signed

Final Audit Report                                                    2023-06-02

| | |
|---|---|
| Created: | 2023-06-02 |
| By: | Angelina Sanchez (asanchez@lobej.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAALFm8rDAMrEEHL1zcweqEe8adK78GSttB |

## "Bennice Complaint 2 June 2023 - to be signed" History

📄 Document created by Angelina Sanchez (asanchez@lobej.com)
2023-06-02 - 7:33:47 PM GMT

📧 Document emailed to Barry Janay (bjanay@lobej.com) for signature
2023-06-02 - 7:34:39 PM GMT

📄 Email viewed by Barry Janay (bjanay@lobej.com)
2023-06-02 - 7:51:20 PM GMT

🔏 Document e-signed by Barry Janay (bjanay@lobej.com)
Signature Date: 2023-06-02 - 7:52:11 PM GMT - Time Source: server

✅ Agreement completed.
2023-06-02 - 7:52:11 PM GMT

**Adobe Acrobat Sign**